UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-80037-CIV-MATTHEWMAN

VICTOR JOSUE TORRES,

        Plaintiff,

v.

KILOLO KIJAKAZI,[1]
Acting Commissioner of Social Security
Administration,

        Defendant

_____/

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT [DEs 35, 38]

**THIS CAUSE** is before the Court upon Plaintiff, Victor Josue Torres' ("Plaintiff") Motion for Summary Judgment [DE 35], and Defendant, Kilolo Kijakazi, the Acting Commissioner of Social Security's ("Defendant") Motion for Summary Judgment [DE 38]. Plaintiff has also filed a reply [DE 40]. The motions are fully briefed and ripe for review. The issue before the Court is whether the record contains substantial evidence to support the denial of benefits to Plaintiff and whether the correct legal standards have been applied. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## I. FACTS

On December 17, 2018, Plaintiff filed a Title II application for disability and disability insurance benefits, and a Title XVI application for supplemental security income, alleging an

_____

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Therefore, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew Saul as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. 405(g).

amended disability onset date of September 26, 2018. [R. 15].[2]  The claim was denied initially and upon reconsideration. [R. 15]. Following a telephone hearing on June 1, 2020 [R. 59–86], the Administrative Law Judge ("ALJ"), Rosanna L. D'Alessio, issued a decision on June 10, 2020, denying Plaintiff's request for disability benefits and supplemental security income. [R. 15–28]. A request for review was filed with the Appeals Council and denied on October 22, 2020. [R. 1–6].

A.   Relevant Hearing Testimony

The ALJ held a hearing by telephone on June 1, 2020. [R. 37]. Plaintiff appeared and was represented by counsel. [R. 37]. At the hearing, a consultative medical examiner; Plaintiff; and a vocational expert testified.

1.  Consultative Medical Examiner

Dr. Steven Goldstein, a consultative medical examiner, testified first as a stipulated medical expert. [R. 43–48]. Based on his review of the medical evidence of record, Dr. Goldstein described Plaintiff's impairments as follows: (1) a seizure disorder, thought to be post-traumatic from Plaintiff's head injury,[3] with the seizures sounding "like some of them may be complex partial seizures with secondary generalization"; (2) headaches stemming from a concussion and medication overuse; (3) left rotator cuff tendonitis; (4) decreased hearing in the left ear; (5) a traumatic brain injury;[4] and (6) a moderate disc bulge and moderate bilateral foraminal narrowing

---

[2] All references are to the record of the administrative proceeding filed by the Commissioner at Docket Entry 27.

[3] Plaintiff briefly testified that his head injury stemmed from an assault which he did not remember. [R. 76]. Plaintiff believed the assault began with an altercation over a girl and remembered his attacker picking him up and slamming him. [R. 76].

[4] Dr. Goldstein appeared to qualify this impairment by noting that he "did not see anyone else note that anywhere in the record." [R. 44]. Additionally, Dr. Goldstein stated that Plaintiff's "decreased sensation on the right side of the body, and . . . fine tremor in the right side" were not seen "elsewhere in the record." [R. 44]. When the tremors were then pointed out in the record, Dr. Goldstein testified that he "didn't see any exam that showed" them. [R. 46].

of the lumbar spine. [R. 43–45]. In describing Plaintiff's impairments, Dr. Goldstein noted that Plaintiff was a smoker, used marijuana, and had used cocaine as recently as September of 2019. [R. 44–45]. Accordingly, with Plaintiff's stated impairments and drug use in mind, Dr. Goldstein testified that Plaintiff's impairments did not meet or medically equal the severity of any listed impairment. [R. 46].

Dr. Goldstein then testified concerning Plaintiff's limitations. In general, Dr. Goldstein testified that he "would certainly think [Plaintiff] would be limited to a light level of physical activities" based on Plaintiff's overall impairments, including "the usual seizure precautions, such as not driving . . . [or] being near any dangerous heights or moving machinery." [R. 46]. More specifically, with respect to limitations stemming from Plaintiff's rotator cuff tendonitis, Dr. Goldstein stated he was "not sure that was something that lasted a 12-month period." [R. 46–47]. As to limitations stemming from Plaintiff's headaches, Dr. Goldstein noted that Plaintiff's headaches "seemed to affect his ability to concentrate." [R. 47]. However, Dr. Goldstein also stated that "obviously, [Plaintiff's] head injury might affect his ability to concentrate" and that Plaintiff's marijuana and cocaine use could also affect his ability to concentrate. [R. 47]. And, with respect to Plaintiff's hallucinations and insomnia—which Dr. Goldstein did not include as impairments— Dr. Goldstein testified that he was "not commenting on the psychiatric aspects of the case." [R. 48].

2.  Plaintiff

Plaintiff testified next, establishing the following facts. Plaintiff was 37 years old at the time of the hearing. [R. 49]. He completed seventh grade but did not make it through to the end of

3

eighth grade. [R. 49]. He is "ESE" and does not read or write at all. [R. 81]. In fact, Plaintiff required assistance when filling out his Social Security forms. [R. 56].

According to Plaintiff, he last worked a couple of months prior to the hearing. [R. 49]. However, Plaintiff did not stay at that job for more than a week and ended up in the hospital. [R. 50]. Before that, in 2013 and from 2015 through 2018, Plaintiff drove a backhoe and worked as a heavy equipment operator, which Plaintiff described as "driving." [R. 50–51]. In 2011, Plaintiff worked as an "electrician helper," although he could not recall how long he had worked at that job because he did not "remember so many things." [R. 52]. That same year, Plaintiff also worked in construction, doing "home repairs, and plumbing," as well as "whatever . . . needed to be done." [R. 52–53]. As part of these jobs, Plaintiff testified that he lifted "a lot of weight," including sheet rock and wiring in excess of 100 pounds. [R. 53–54].

Plaintiff is right-handed and has tremors. [R. 55]. His fingers and hands lock up and he "can't get them to do what [he] want[s] them to do." [R. 55]. When his fingers or hands lock up, he loses all strength and "go[es] to shaking bad and . . . can't grip anything." [R. 55]. While Plaintiff previously had tremors once every three months, Plaintiff now has them almost every day. [R. 56].

Similarly, Plaintiff also has seizures almost every day. [R. 57]. Plaintiff described a great week as being when he can go three or four days without having a seizure.[5] [R. 57]. Plaintiff's seizures "just keep[] getting worse," and paralyze and frighten him. [R. 57]. He is uncertain about the duration of his seizures when he is experiencing them; he simply prays until he wakes up and they are gone. [R. 57]. Although Plaintiff will occasionally be okay when he wakes up, he will at times wake up and need to pray himself back to sleep again. [R. 57–58].

---

[5] However, Plaintiff also stated that he could go "[m]aybe as long as a full day" without having a seizure. [R. 71].

Plaintiff is "overwhelmed" by his seizures' symptomatology. [R. 58]. Because of the seizures, Plaintiff cannot drive, often loses his appetite, tends to isolate, and avoids seeing others or doing anything social. [R. 56–58, 62, 72]. Plaintiff is embarrassed by his condition and does not want others to see him shaking "like Mohammed Ali." [R. 62]. Plaintiff even avoids his roommate, with her needing to "pretty much break the door down" to check on him. [R. 63].

In a typical day, Plaintiff remains isolated and does not really do much. [R. 60]. He feeds his chickens but cannot clean or cook, although he tries. [R. 60]. Plaintiff's mother comes over "every now and then" to "help . . . with [Plaintiff's] clothes." [R. 60]. Likewise, Plaintiff's roommate also helps when she is not at work. [R. 60]. She cooks for Plaintiff, "helps [Plaintiff] . . . with clothes and whatever paperwork," and "pretty much . . . does it all." [R. 61–62]. Indeed, Plaintiff has problems keeping up with his hygiene and needs reminders from his roommate on when to shower, shave, and conduct his daily living activities, including when to take his medications and when to go to his appointments.[6]  [R. 70–71].

With respect to Plaintiff's mental issues, Plaintiff has mood swings that are "so bad that [he] had to leave his children." [R. 63]. He goes from "zero to a hundred sometimes" and is verbally disrespectful. [R. 63]. He breaks things and is unaware that he has done so until he wakes up. [R. 63]. Plaintiff is also depressed. [R. 64]. He has trouble falling and staying asleep and often sleeps for only an hour or two at a time. [R. 64]. He has recurring nightmares involving "seeing this lady, or I don't know what the heck it is," making it such that Plaintiff "sometimes [does not] even want to fall asleep." [R. 65].

---

[6]  Plaintiff's roommate also takes him to his appointments. [R. 72].

Plaintiff experiences pain all over his body, including back pain, leg pain, headaches, and shoulder pain. [R. 65–67]. Plaintiff's back pain is "pretty much" in his lower back and radiates down into his legs and to the bottom of his feet. [R. 68]. Plaintiff's headaches go "all the way down to [his] cheek and [to the] back of [his] eyeball," with a constant pressure in his face. [R. 66]. Plaintiff's neck pain radiates down his arms, sometimes more so on his right side, and leads to an inability to lift his head and a feeling of dizziness when looking up. [R. 66–67]. And, Plaintiff's shoulder pain causes Plaintiff to be unable to reach above his head with his left arm. [R. 67].

Plaintiff's pain is always present and never goes away. [R. 66]. While Plaintiff's medications "ease[] it up a little," the pain "doesn't stop." [R. 68–69]. If Plaintiff's medications wear off, Plaintiff is in "triple the pain." [R. 69]. This pain also causes limitations in Plaintiff's posture. [R. 69–70]. Though Plaintiff can bend or twist to a certain degree, Plaintiff cannot sit still and "can't really sit down" because of his back and leg pain, and he must rotate between standing up and sitting down. [R. 65, 69]. According to Plaintiff, he "can't sit down for less than half an hour, five, ten minutes" and lies down "to try to get things off and stretch and stuff." [R. 70].

Plaintiff has been compliant with taking his medications as prescribed. [R. 71]. However, similar to Plaintiff's pain medications, his seizure medications are not entirely effective, as they "ease[ his seizures] up," but do not stop them. [R. 71]. Thus, Plaintiff's pain, seizures, and other symptomatology continue. [R. 69–71].

Additionally, Plaintiff has daily issues with memory, concentration, and being confused. [R. 72]. He cannot concentrate and cannot get whatever nightmare he just had out of his mind. [R. 72–73]. In fact, beyond nightmares, Plaintiff hallucinates daily and keeps seeing an older lady "walking and trying to say something," which frightens him. [R. 73]. When questioned concerning

6

his drug usage, Plaintiff testified that he rarely drinks alcohol, but stated that he has used marijuana and has used cocaine "last year, [maybe] the year before." [R. 74–75]. However, Plaintiff has "never been a drug abuser or none of that." [R. 75].

###### 3.  Vocational Expert

Dr. Jeffery Lucas, the vocational expert ("VE"), testified at the hearing. [R. 77–82]. He first classified Plaintiff's prior work of "construction worker II," "electrician helper," and "heavy equipment operator." [R. 77–78]. The ALJ then posed a hypothetical involving an individual with the same work experience as Plaintiff, who: (1) is capable of lifting and/or carrying up to 20 pounds occasionally and up to 10 pounds frequently; (2) would be able to stand and walk for a total of six hours in an eight-hour workday; (3) would be able to sit for a total of six hours in an eight-hour workday; (4) would need to avoid hazards such as moving machinery and unprotected heights; (5) would be unable to operate or drive machinery; (6) could occasionally lift overhead with his or her left extremity; (7) would require simple routine tasks in a stable work environment, with no fast-paced high production demand; and (8) would require verbal instructions given by supervisors in order to complete his or her tasks. [R. 78–79]. The VE explained that such an individual would not be able to perform his or her past relevant work, as actually or customarily performed. [R. 79]. However, "taking into consideration a hypothetical claimant having [Plaintiff's] age of 37, with a seventh-grade education," as well as the same limitations identified above, the VE then explained that the hypothetical individual could perform other unskilled jobs in the national economy, such as "cleaner," "cafeteria attendant," and "marker." [R. 79].

Next, Plaintiff's counsel posed a series of hypotheticals to the VE in which the hypothetical individual described by the ALJ: (1) would also require the ability to alternate between sitting and

standing every hour as needed; (2) could only occasionally "finger" due to hand tremors; or (3) was limited to nothing but incidental interactions with coworkers and only occasional interactions with supervisors. [R. 80–82]. As to the former, the VE opined that the marker position would remain and that the cleaner and cafeteria attendant positions could be replaced by router and document preparer positions, respectively (although he noted that the cafeteria attendant position would generally have a sit/stand option). [R. 80]. And, with respect to the hypothetical individual that could only occasionally "finger" due to his hand tremors or that was limited to nothing but incidental interactions with coworkers and only occasional interactions with supervisors, the VE opined that the marker position would remain "as eroded," the router and cafeteria attendant positions would remain, and the document preparer position would not remain. [R. 81–82].

### B.   Medical Record Evidence

In reaching her decision to deny Plaintiff's benefits, the ALJ reviewed the medical evidence of record, the relevant portion of which is summarized chronologically below.

#### 1.   Pre-Amended Onset Date Evidence

The medical record evidence begins with a September 9, 1993 report from Rhonda C. McLymont, a licensed school psychologist. [R. 505–09]. When Plaintiff was ten years old and in third grade, Plaintiff's third-grade teacher referred him to Ms. McLymont because of his weak academic skills and limited academic success. [R. 505, 508]. Ms. McLymont conducted an assessment of Plaintiff, finding "severe processing deficits in the areas of auditory processing, perceptual speed and verbal ability" and learning disabilities "in the areas of reading, mathematics, written language, spelling and handwriting." [R. 508].

Nearly twenty years later, on January 18, 2014, Plaintiff was assaulted by an unknown assailant and sustained multiple injuries to his head. [R. 555]. Specifically, according to a friend at the scene of the incident, the assailant struck Plaintiff in the face and repeatedly and forcibly drove Plaintiff's head into the concrete. [R. 555]. Plaintiff presented to Oscar Martinez, M.D., reporting a loss of consciousness, amnesia, confusion, a contusion, disorientation, a headache, and nausea. [R. 555]. Dr. Martinez conducted a physical examination of Plaintiff, finding "signs of a basilar skull [fracture], contusion, abrasion, large raised hematoma on left temporal, . . . right frontotemporal aspect, [and] hemotympanum of [the] left ear." [R. 556]. Accordingly, Dr. Martinez ordered multiple CT scans to verify the extent of Plaintiff's injuries.

A CT scan of Plaintiff's brain revealed "left temporoparietal scalp contusion with subarachnoid hemorrhage in the left hemisphere and hyperattenuation of the left tentorium concerning for small amount of para tentorial subdural hemorrhage." [R. 559, 566]. A CT scan of Plaintiff's cervical spine was negative. [R. 559, 566]. And, a CT scan of Plaintiff's maxillofacial skeleton revealed a nondisplaced fracture of the nasal bone and minor mucosal thickening. [R. 567]. Based on Plaintiff's physical examination and CT scan results, Plaintiff was transferred to Saint Mary's Medical Center for neurosurgery evaluation/care. [R. 513, 561].

At Saint Mary's, Plaintiff was taken to the intensive care unit and examined by a multitude of different doctors, who diagnosed Plaintiff with "subarachnoid hemorrhage and bilateral temporary bone fractures." [R. 511–518, 520, 551]. Importantly, Plaintiff's treatment notes from Saint Mary's reflect that Plaintiff was previously involved in a car accident in which he "sustained chronic pain." [R. 510]. Moreover, Plaintiff's treatment notes reflect that Plaintiff had a "history

of polysubstance abuse," including "use of alcohol and cocaine, which [Plaintiff's] wife noted had been worse more recently." [R. 510].

Ultimately, Plaintiff was discharged from Saint Mary's on January 27, 2014. [R. 510, 512]. Upon discharge, Plaintiff was "hemodynamically stable and neurologically stable, awake, alert, [and] following commands." *See* R. 512. He was prescribed Keppra as a prophylactic measure to prevent seizures. [R. 512].

The medical record is devoid of evidence from the next several years. However, on March 10, 2017, Plaintiff presented to the Emergency Department of Hendry Regional Medical Center, complaining of an aching and non-radiating "back or flank pain," as well as left shoulder pain. [R. 592–93, 596]. Plaintiff reported that the onset was two weeks prior and that the symptoms "came on gradually."[7] [R. 592]. Plaintiff stated that the pain was at a 3 on a scale of 1-10, and that it was worse with movement. [R. 596–97]. Bernardo Kruszel, M.D., provided an impression of "exacerbation low back pain" and prescribed Robaxim and Ultram for the pain. [R. 599].

Later that same year, on July 25, 2017, Plaintiff again visited Hendry Regional Medical Center's Emergency Department, complaining of generalized pain. [R. 578]. While Plaintiff stated the onset was one or two days prior and described his pain as severe (at a level of 10 out of 10), Plaintiff reported chronic "pain to his legs, tooth, back and all over his body . . . since 2013." [R. 579, 580, 584]. A physical examination of Plaintiff revealed right and left-sided back and thigh tenderness, as well as mild tenderness with palpation. [R. 586]. Moreover, a urinalysis revealed a positive finding for THC. [R. 589]. Miguel Trujillo, D.O., assessed "body aches—musculoskeletal pain and physical exhaustion." [R. 582].

---

[7] Nonetheless, Plaintiff also reported a history of chronic back pain. [R. 593].

2.   Amended Onset Date Evidence

Subsequently, on September 26, 2018—the amended alleged onset date—Plaintiff presented to Thomas M. Abraham, M.D., reporting that he "started having seizures last night continuously." [R. 617–19]. In this regard, Plaintiff reported that he was "not compliant with his seizure medication and . . . did not understand that he needed to take his seizure medication as prescribed."[8] [R. 617]. While Plaintiff blamed this lack of understanding on his dyslexia, Dr. Abraham noted that Plaintiff nonetheless reported "being told by many clinicians . . . to take [his seizure medications] as prescribed" and additionally noted that Plaintiff last took Keppra "2 months ago and . . . did not like the way he felt."[9] [R. 617].

Regardless, at Plaintiff's September 26, 2018 visit with Dr. Abraham, Plaintiff also complained of elevated blood pressure, a severe headache "now 8/10 with blurry vision," dizziness, and . . . a staggered gait," as well as "confusion[,] . . . depression, . . . generalized weakness," extremity pain, lumbar pain, and myalgias.[10] [R. 617–18]. A physical examination of Plaintiff revealed that he was "somewhat somnolent, but keenly responsive," and that Plaintiff had swelling and redness in his right eyelid. [R. 618]. Moreover, an MRI of Plaintiff's brain revealed suspected post trauma concussion syndrome. [R. 626, 661].

Dr. Abraham diagnosed Plaintiff with "acute encephalopathy secondary to seizure and postictal stat," status epilepticus, "headache secondary to above," hypertensive urgency, a gastrointestinal bleed with stable hemoglobin, chronic back pain with radiculopathy, abdominal

---

[8] While it is unclear when Plaintiff was prescribed this seizure medication, it appears that Plaintiff's Keppra prescription from January 2014 had been continuously prescribed. However, at Plaintiff's March 10, 2017 and July 25, 2017 visits to Hendry Regional Medical Center, there were "no known [current] medications" listed. [R. 592, 578].
[9] That same day, Plaintiff was also seen by Andrew D. Dygert, D.O. [R. 628]. Dr. Dygert noted that Plaintiff was not taking "Keppra or other anti-epileptics regularly." [R. 628].
[10] Plaintiff reported smoking a pack of cigarettes a day and using marijuana for pain relief. [R. 618].

pain, neuropathy, depression, anxiety, blepharitis of the right eye, a history of hearing loss with tinnitus, tobacco use disorder, and medication noncompliance. [R. 625]. He prescribed Plaintiff Norvasc, Fioricet, Neurontin, Keppra, Ativan, Nicoderm, Protonix, Mysoline, Carafate, Sucralfate, Tobrex, Topamax, and Desyrel. [R. 553–54].

   3.   Post-Amended Onset Date Evidence

   i.   Dr. Hans-Louis Charles

Plaintiff next saw Dr. Hans Louis-Charles, on December 4, 2018, for "medical and medications management." [R. 970]. At that appointment, a physical examination of Plaintiff was unremarkable. However, Plaintiff reported pain at a level of 8 out of 10. [R. 971]. Thus, based on Dr. Louis' physical examination of Plaintiff—combined with Plaintiff's injury history and complaints of pain—Dr. Louis-Charles assessed "absent seizure," chronic migraine headaches, essential tremors, a post-traumatic brain injury, chronic lower back pain, severe anxiety disorder, and PTSD.[11] [R 972].

   ii.   Dr. Michael Rosenberg

Michael Rosenberg, M.D., examined Plaintiff at the behest of the Disability Determination Division, on January 31, 2019. [R. 662]. During the examination, Plaintiff reported decreased hearing in his left ear and "personality changes characterized by outbursts of anger, irrationality, mood swings, aggressive [behavior], . . . decrease[d] comprehension . . . [and] episodes of disorientation" stemming from his 2014 head trauma. [R. 662]. Moreover, Plaintiff stated he had

---

[11] Plaintiff presented to Dr. Louis-Charles multiple times over the next several months for medication management, often with normal examination results. [R. 974, 976, 979, 994, 983, 986]. However, on Plaintiff's May 3, 2019 and July 3, 2019 follow-up appointments with Dr. Louis-Charles, Plaintiff again complained of pain at a level of 8 out of 10. [R. 984, 986].

developed seizures, with his last seizure occurring just one day prior. [R. 662]. Indeed, Plaintiff noted that many of these seizures were within the past six months, that the seizures were increasing in frequency, and that the seizures: (1) were brought on by nervousness; (2) occurred spontaneously; (3) were exacerbated by light; and (4) did not result in loss of bowel or bladder control or make Plaintiff bite his tongue. [R. 662].

Beyond Plaintiff's mental and neurological changes, Plaintiff also reported a history of radiating back pain and left shoulder pain that began in 2009 after he was involved in a motor vehicle accident. [R. 662]. Plaintiff stated these pains were constant and were a 10 out of 10 in severity. [R. 662]. Plaintiff described the pains as "sharp, dull, and achy," noting that they were made worse by "walking, standing, sitting, bending, and use." [R. 662]. Additionally, Plaintiff informed Dr. Rosenberg that he "uses" marijuana and that he "stopped using cocaine." [R. 663].

Dr. Rosenberg conducted a physical examination of Plaintiff, finding that Plaintiff was in no acute distress, had no balance issues, and was able to rise from his chair without difficulty. [R. 664]. However, Plaintiff had a head tremor; a "[d]ecreased finger snap left ear"; pain with movement in his lumbosacral spine, cervical spine, and left shoulder; fine tremors in his right hand; and a slight decrease in sensation in his right extremities. [R. 665]. Consequently, Dr. Rosenberg diagnosed Plaintiff with "traumatic brain injury characterized by decreased hearing in the left ear, head tremor and right-hand tremor, personality disorder changes including mood swings, loss of comprehension, and disorientation." [R. 665]. He also diagnosed Plaintiff with dizziness (by history, and not by physical examination), a seizure disorder, moderate back and left shoulder pain, and mild neck pain. [R. 665]. Upon referral from Dr. Rosenberg thereafter, an x-ray of Plaintiff's

lumbar spine revealed minimal vascular calcification. [R. 667]. However, an x-ray of Plaintiff's left shoulder was unremarkable. [R. 668].

    iii.    <u>Dr. Daniel Ward</u>

Daniel L. Ward, Ph.D., also conducted a consultative examination of Plaintiff for the Division of Disability Determinations, on February 5, 2019. [R. 673]. Plaintiff reported experiencing ongoing seizure activity, with approximately 8-10 seizures per month, daily night tremors, daily severe headaches, slowed thinking, short-term memory problems, vacillating speech difficulties, bouts of confusion and disorientation, difficulty concentrating and focusing, problems with equilibrium, low frustration tolerance, daily anger outbursts, protracted depression, chronic trauma related symptoms, and panic attacks which occur "like three times a week" and last "2 to 5 minutes." [R. 674]. Moreover, Plaintiff reported being in chronic pain, with pain in his back and neck radiating down to his arms and hands. [R. 673]. And, Plaintiff stated he could not grip anything due to a "shakiness" that comes and goes. [R. 673].

With respect to Plaintiff's compliance with his medications, Plaintiff stated he had stopped taking his anticonvulsant medications a year after his 2014 injury because he "felt [he] was better." [R. 673]. However, while off his medications, Plaintiff reported experiencing seizure activity "every night," which he described as "tremors without loss of consciousness."[12] [R. 673]. Indeed, Plaintiff's friend and roommate, Berneace Pereiro—who accompanied Plaintiff to the examination—stated that, while Plaintiff was off his medications, he had nightly tremors and "big" seizures once a week. [R. 673]. She also noted that, while Plaintiff started anticonvulsant

---

[12] Dr. Ward noted that Plaintiff's description of seizure activity beginning in June 2018 "appeared consistent with grand mal seizures." [R. 673].

medications in June of 2018 and "wasn't completely compliant," after Plaintiff experienced a severe seizure around October of 2018 that led to his hospitalization, Plaintiff had since been compliant with taking his medications. [R. 673–64]. Nonetheless, despite Plaintiff's compliance, Ms. Pereiro asserted that Plaintiff continued to experience nightly tremors and seizure activity once a week, albeit with a reduced intensity and duration.[13] [R. 674].

As part of Dr. Ward's examination, Plaintiff also reported that he smokes a pack of cigarettes a day and has been "abusing" marijuana since he was eleven or twelve years old. [R. 674]. In fact, Plaintiff described daily marijuana use for "twenty something years now." [R. 674]. Similarly, Plaintiff began "abusing" powder cocaine when he was nineteen years old, using it every other weekend over the course of a three-year period. [R. 674]. Although Plaintiff eventually stopped using cocaine, Plaintiff used cocaine again in the months leading up to his 2014 head trauma and in March of 2018. [R. 674].

During the consultative examination, Dr. Ward noted that Plaintiff appeared to be in obvious physical pain, with a stiff and awkward seated posture. [R. 676]. In this regard, "on several occasions, [Plaintiff] stood and walked a few steps about the room, then sat again." [R. 676]. As to Plaintiff's mental condition, Dr. Ward described Plaintiff's chronic trauma related symptoms as being consistent with PTSD, noted issues with Plaintiff's memory, and detailed Plaintiff's recent auditory and visual hallucinations, which scared Plaintiff. [R. 676–77].

Accordingly, Dr. Ward diagnosed Plaintiff with major depressive disorder, recurrent with mood-congruent psychotic features; panic disorder; PTSD; mild cannabis use disorder; cocaine use disorder (remission for 10 months); and an unspecified neurocognitive disorder. [R. 677]. He

---

[13] This is contrary to Plaintiff's assertion of 8-10 seizures per month.

then assessed limitations in Plaintiff's task persistency, recommended that Plaintiff receive assistance in managing his funds, noted that Plaintiff was able "to see to his own immediate needs without unusual assistance," and found that Plaintiff appeared to be "socially handicapped to some degree at this time due to poor anger control, protracted depression, panic attacks, and chronic trauma symptoms." [R. 678]. Thus, as to Plaintiff's ability to perform work-related activities, Dr. Ward opined:

> It appears [Plaintiff's] current physical condition is likely causing an equal if not greater impediment to work activity at this time. If his physical condition permitted some work activity, [Plaintiff] would likely require more encouragement and support than do most people when encountering work difficulties or social challenges. It appears he would not do well in occupations requiring frequent protracted or demanding social interactions. However, given his current physical and mental health presentations, it appears [Plaintiff] would likely have significant difficulty effectively managing the expectations of employment at this time.

[R. 678].

iv.     Imaging Studies

In early to mid-February 2019, Plaintiff fell from the side of a moving truck, possibly due to having a seizure. [R. 91, 680–89]. Other than x-ray imaging revealing foreign bodies in his right elbow and forearm due to his fall, a CT scan of Plaintiff's lumbar spine revealed spondylosis and a "possible right paracentral disc protrusion at L4-5." [R. 681, 685–86]. A CT scan of his head revealed "no evidence of an acute intracranial process." [R. 683]. And, a CT scan of Plaintiff's cervical spine revealed no evidence of an acute fracture. [R. 684].

v.      Disability Determination – Initial Level

In a Disability Determination Explanation at the Initial Level, on February 6, 2019, Lily Rocha, M.D., performed a residual functional capacity assessment of Plaintiff. [R. 94–96, 112–14]. With respect to Plaintiff's exertional limitations, she stated Plaintiff could: (1) occasionally

lift and/or carry 50 pounds; (2) frequently lift and/or carry 25 pounds; (3) stand and/or walk for a total of six hours in an eight hour workday; (4) sit for a total of six hours in an eight-hour workday; and (5) push and/or pull an unlimited amount, other than shown, for lift and/or carry. [R. 94–95, 112–13]. As to Plaintiff's postural limitations, she stated Plaintiff could climb stairs/ramps, balance, stoop, kneel, crouch, and crawl an unlimited amount, but could never climb ladders/ropes/scaffolds. [R. 95, 113]. And, with respect to Plaintiff's environmental limitations, Dr. Rocha stated Plaintiff should avoid all exposure to hazards such as machinery or heights.[14]   [R. 95–96, 113–14]. On February 14, 2019, Kumar Swami, M.D., agreed with Dr. Rocha's findings, except he found that Plaintiff's daily living activities "suggest[ed] that he can sustain forty hour workweeks." [R. 91, 710].

Similarly, on February 19, 2019, Nicholas Rios, Psy.D. completed a mental residual functional capacity assessment as part of the same Disability Determination Explanation at the Initial Level. [R. 96–98, 115–16]. Dr. Rios determined that Plaintiff had limitations in understanding and memory, limitations in sustained concentration and persistency, limitations in social interaction, and limitations in adaptation. [R. 96–98, 115–16]. Specifically, as to Plaintiff's limitations in understanding and memory, Dr. Rios noted that Plaintiff was moderately limited in his ability to understand and remember detailed instructions. [R. 97, 115]. With respect to

---

[14] Dr. Rocha amended her residual functional capacity assessment on March 25, 2019. [R. 130–32]. She stated that Plaintiff should avoid *concentrate*d exposure to hazards such as machinery or heights, rather than *all* exposure. [R. 132]. Notably, she also removed language stating that Plaintiff:

> will never have complete recovery with this massive head injury. It has already been 5 year[s] since his trauma, and he still suffers from limited comprehension. He could not sustain 8 hour work day 5 days a week, as he would be a danger to coworkers and himself from poor seizure control, dyslexia and now comprehension and memory issues. [T]he simple tasks he is able to do are within his safe familiar home environment with supervision from his caregiver.

*Compare* R. 96, *with* R. 132.

Plaintiff's limitations in sustained concentration and persistence, he stated that Plaintiff was moderately limited in his ability to: (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) work in coordination with or in proximity to others without being distracted by them; and (4) "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." [R. 97, 115].

Next, as to Plaintiff's limitations in social interactions, Dr. Rios found that Plaintiff was moderately limited in his ability to interact appropriately with the general public. [R. 98, 116]. And, as to Plaintiff's limitations in adaptation, Dr. Rios opined that Plaintiff was moderately limited in his ability to respond appropriately to changes in a work setting. [R. 98, 116]. Joan Joyson, Ph.D., agreed with Dr. Rios' mental residual functional capacity assessment of Plaintiff. [R. 711–14]. Thus, despite Plaintiff initially being found disabled, the Office of Quality Review disagreed and found that Plaintiff was not disabled, based on the aforementioned examinations. [R. 100, 118, 136, 153, 169, 186].

    vi.    <u>Drs. Anthony Hall, Jamie Plante, and Barry Werries</u>

Subsequently, on June 4, 2019, Plaintiff presented to Anthony Hall, M.D, upon a referral from his primary care practitioner. [R. 765]. Plaintiff reported "shaking episodes" that led to losing strength in his hands, tightening of his jaw, and "blacking out," with the most recent episode occurring two days prior. [R. 765]. An examination of Plaintiff revealed a restricted range of motion and pain in Plaintiff's neck, tenderness of the lower lumbar region, restricted left shoulder abduction and elevation, and a slightly antalgic gait. [R. 766]. Dr. Hall assessed lower back pain,

other chronic pain, and a cerebral contusion and laceration with loss of consciousness due to brain injury. [R. 766].

Just two days later, on June 6, 2019, Plaintiff visited Jamie W. Plante, M.D, complaining of tremors, a headache, and seizures since 2014. [R. 721]. In fact, Plaintiff reported that since his 2014 assault, "he began having events of sudden onset tonic posturing of arms with facial twisting and grimacing lasting a minute or [two] followed by generalized fatigue." [R. 721]. In this regard, Plaintiff "endorsed at least 2 separate significant events with more than 5 or 6 seizures in 1 evening and another event in which he lost consciousness in the car and woke up several hours later confused and fatigued." [R. 722]. Plaintiff also reported chronic lower back pain and upper back pain with radiation into his left lower extremity and stated that he had insomnia and could not tolerate crowds, loud noise, or bright lights.[15] [R. 722]. Dr. Plante conducted an examination of Plaintiff, finding decreased sensation on the left side of Plaintiff's face. [R. 722–23]. Dr. Plante noted that Plaintiff's "daily headaches, sensitivity to stimulus, insomnia, [and] mood lability with irritability" were consistent with post-concussive syndrome, and that Plaintiff's headaches in particular were "consistent with post[-]traumatic post[-]concussive syndrome with significant analgesic overuse rebound." [R. 724]. Dr. Plante also noted that Plaintiff had been unable to tolerate his Keppra and Dilantin medications because of mood and irritability, prescribing Depakote and recommending post-concussive syndrome physical therapy. [R. 722, 724].

Plaintiff presented to Barry Werries, M.D., on June 27, 2019 for an appointment concerning his left shoulder. [R. 762]. Plaintiff reported pain in his left shoulder since 2009 that

---

[15] Notably, Plaintiff also reported being placed on Keppra and Dilantin but being unable to tolerate the medications because of his mood and irritability. [R. 722].

was "an 8 out of a 10 every day." [R. 762]. He stated it was worse when he was lifting his arm or picking something up, and that nothing made him feel better. [R. 762]. Plaintiff also reported "numbness and tingling that goes all the way down his arm to his long and ring fingers and . . . tingling in his forearm." [R. 762]. Dr. Werries assessed tendinitis of the left rotator cuff. [R. 763]. A physical examination revealed a spasm in Plaintiff's left shoulder with lateral tenderness. [R. 763]. Dr. Werries recommended physical therapy and Naprosyn. [R. 763].

vii.   Disability Determination - Reconsideration

Subsequently, in a Disability Determination Explanation at the Reconsideration Level, on July 19, 2019, Jennifer Meyer, Ph.D., completed a mental residual functional capacity assessment of Plaintiff. [R. 206–07, 227–29]. Her mental residual functional capacity assessment of Plaintiff was identical to Dr. Rios' assessment at the Initial Level, except that Dr. Meyer found Plaintiff was not significantly limited in his ability to work in coordination with or in proximity to others without being distracted by them. [R. 206–07, 227–29]. Similarly, in the same Disability Determination Explanation at the Reconsideration Level, on July 20, 2019, Isaac Moore, M.D., completed a residual functional capacity assessment of Plaintiff. [R. 202–05, 224–27]. His residual functional capacity assessment, too, was identical to an examination from the Initial Level. Specifically, his residual functional capacity assessment of Plaintiff was identical to Dr. Rocha's March 25, 2019 amended functional capacity assessment. *Compare* R. 130–32, *with* R. 202–05. Thus, at the Reconsideration Level, Plaintiff was again found to be not disabled. [R. 209, 231].

viii.   Drs. Jamie Plante, Jean Fleurinor, Ronald Young, and Barry Werries

On July 26, 2019, Plaintiff underwent an MRI of his lumbar spine, which revealed "degenerative changes . . . with foraminal narrowing" and "annular tears at L5-S1." [R. 768]. And,

20

shortly thereafter, on August 8, 2019, Plaintiff underwent an EEG, which showed "occasional right temporal sharp waves that indicate an epileptic potential," although "no electrographic seizures [were] seen." [R. 827].

Around this same time, on July 30, 2019, August 1, 2019, and August 22, 2019, Plaintiff saw Jean Fleurinor, M.D., Ronald Young, M.D., and Dr. Werries, respectively. [R. 770, 877, 874–75]. At Plaintiff's visit with Dr. Fleurinor, Plaintiff reported muscle aches, arthralgias/joint pain, and back pain. [R. 773]. At his appointment with Dr. Young, Plaintiff complained of increasing left leg pain and numbness, and rated his lower back pain as a 10 out of 10. [R. 877]. And, at his appointment with Dr. Werries, Plaintiff complained of neck and shoulder pain. [R. 874].

Dr. Fleurinor's physical examination of Plaintiff revealed that Plaintiff was anxious and had: (1) decreased hearing; (2) a tender neck with nuchal rigidity; (3) tenderness and limited range of motion in his musculoskeletal system; and (4) an irregular gait. [R. 773]. Dr. Young's physical examination of Plaintiff revealed that Plaintiff appeared "quite comfortable," with pain in his back and tenderness throughout his thoracolumbar spine. [R. 878]. Dr. Werries' physical examination of Plaintiff, in turn, revealed "spasm in the trapezium and left side of [Plaintiff's] neck . . . [with] some lateral tenderness around the shoulder." [R. 875]. Accordingly, Dr. Fleurinor assessed lumbago with sciatica, cervical spine sprain, lumbar sprain, gastrointestinal hemorrhage, a history of nontraumatic ruptured cerebral aneurysm, benign essential hypertension, gastroesophageal reflux disease without esophagitis, chronic depression, a seizure disorder, and tinea corporis. [R. 780–81]. Dr. Young assessed lumbar disc disease. [R. 878]. And, Dr. Werries assessed tendinitis of the left rotator cuff and cervicalgia. [R. 875].

Thereafter, on September 10, 2019, Plaintiff returned to Dr. Plante. [R. 840]. Dr. Plante noted that, despite Plaintiff starting his Depakote medication, Plaintiff had "2 seizures last month but they were mild and he did not lose consciousness." [R. 840]. Moreover, Dr. Plante reported the following:

> [Plaintiff] continues to have insomnia, can not tolerate crowds, loud noise, bright lights. He endorsed mood lability with irritability and intolerance. He also reported daily headaches holocephalic pressure-like pain present upon waking and going to sleep. He reports hypersensitivity to peripheral scalp and occipital pain. Previously he had been taking 6 Fioricets a day and states if he does not take 1 his headaches are terrible. He also endorsed being placed on Topamax which did not help his headaches and further made his cognitive fog worse. He reports chronic low back pain and upper back pain with radiation into his left lower extremity since the trauma. He was placed on high doses of opioids for pain and has been trying to wean down and off states that he went from 30 mg OxyContin down to 5 mg of Percocet. He is seeing pain management who is working with him on alternative therapies.

[R. 841]. A neurological examination revealed decreased sensation in the left side of Plaintiff's face. [R. 842]. Accordingly, because the number of Plaintiff's seizures decreased with Depakote, Dr. Plante recommended that Plaintiff continue Depakote, diagnosing him with intractable epilepsy without status epilepticus, unspecified epilepsy type, post-concussive syndrome, seizures, and traumatic brain injury with loss of consciousness. [R. 843–44].

ix.     Dr. Hans Louis-Charles' Examination

Dr. Hans Louis-Charles completed a mental residual functional capacity and physical capacity evaluation of Plaintiff, on September 20, 2019. [R. 792–98]. In his mental residual functional capacity assessment, Dr. Louis-Charles described Plaintiff as moderately impaired overall. [R. 793]. He then assessed limitations in Plaintiff's social interactions, sustained concentration and persistence, and adaptation. [R. 793–96]. With respect to Plaintiff's social interactions, Dr. Louis-Charles stated that Plaintiff had a moderate impairment in his ability: (1)

22

to accept instruction from or respond appropriately to criticism from supervisors or superiors; (2) to respond appropriately to co-workers or peers; and (3) to relate to the general public and maintain socially appropriate behavior. [R. 793–94]. As to Plaintiff's sustained concentration and persistence, Dr. Louis-Charles stated that Plaintiff had: (1) mild impairments in his ability to maintain attention and concentration for more than brief periods of time and to perform at production levels expected by most employers; (2) moderate impairments in his ability to perform and complete work tasks in a normal work day or week at a consistent pace, to process subjective information accurately and to use appropriate judgment, and to carry through instructions and complete tasks independently; and (3) a marked limitation in his ability to work in cooperation with or in proximity to others without being distracted by them. [R. 794–95].

And finally, as to Plaintiff's adaptation, Dr. Louis-Charles assessed: (1) mild impairments in Plaintiff's ability to remember locations and workday procedure and instructions, to be aware of normal hazards and take necessary precautions, to behave predictably, reliably and in an emotionally stable manner, and to tolerate customary work pressure; and (2) moderate impairments in Plaintiff's ability to respond appropriately to changes in work setting, and to maintain personal appearance and hygiene. [R. 795]. Dr. Louis-Charles thus concluded Plaintiff was likely to deteriorate if placed under the stress of a job, noting that Plaintiff's impairment "lasted or is to be expected to last 12 months or more." [R. 796].

As for Dr. Louis-Charles' physical capacity evaluation of Plaintiff, he stated Plaintiff could stand/walk for three hours at one time in an eight hour workday; could stand/walk for two hours total throughout an eight hour workday; could sit for four hours at a time in an eight hour workday; could sit for five hours total in an eight hour workday; could occasionally lift between 11 and 20

pounds; could use his hands for repetitive grasping, pushing and pulling, and fine manipulation; could use his feet for repetitive movements; could occasionally bend, squat, and crawl, but could never climb; and could reach above his shoulder level. [R. 797–98].

x.      Additional Doctors, Therapy, and a Baker Act

On September 20, 2019, Plaintiff presented to Rafael Angel Baez Stella, M.D. [R. 853]. There, Plaintiff complained of a headache and seizures, as well as insomnia, anxiety, and depression. [R. 854]. A physical examination of Plaintiff revealed that he was in no acute distress and had a normal gait and station. [R. 854–55]. Indeed, Plaintiff saw Dr. Baez Stella several times over the coming months, with largely normal physical examination findings. [R. 858–60, 865].

Plaintiff also presented to Russell Feit, M.D., on September 26, 2019, for an evaluation of his chronic neck and lower back pain. [R. 1080]. Plaintiff described his cervical and back pain as a 10 out of 10, and stated that his pain was exacerbated by sitting, standing, walking, lifting, bending, and lying down. [R. 1080]. Dr. Feit conducted a physical examination of Plaintiff, which returned entirely unremarkable findings. [R. 1081]. Nonetheless, Dr. Feit assessed chronic prescription opiate use, lumbar facet arthropathy, chronic pain, and cervicalgia. [R. 1081]. He stated he would schedule Plaintiff for a "bilateral L2, L3, L4, [and] L5" medial branch block procedure.[16] [R. 1082].

Plaintiff underwent mental therapy from September 26, 2019, to October 30, 2019. [R. 896]. However, his therapy was unsuccessful, as no goals or objectives were achieved. [R. 896]. In fact, Plaintiff was discharged "due to having 2 missed appointments, as per agency policy." [R.

---

[16] Notably, the next day, on September 27, 2019, Plaintiff presented to Robert C. Gerring, M.D., complaining of sinus problems. [R. 941]. At that appointment, Plaintiff reported a "history of cocaine use, last reported 1 week ago" which he stated, "helps him breathe." [R. 941].

897]. Similarly, Plaintiff also underwent physical therapy from September 6, 2019, through October 25, 2019. [R. 920–39]. At Plaintiff's first visit (on September 6, 2019), he complained of "constant severe pain going from [left] side of the neck shooting down his [left] shoulder with numbness/tingling at his last 2 fingers with spasm, and swelling at his [left] UT's." [R. 938]. By Plaintiff's seventh and final visit, on October 25, 2019, Plaintiff still complained of left shoulder pain. [R. 920].

With respect to Plaintiff's mental condition, on October 23, 2019, Brett Jamie Negin, M.D., performed a psychiatric evaluation of Plaintiff. [R. 909–14]. While Dr. Negin's notes are minimal and nearly illegible, Dr. Negin did note that Plaintiff's attitude was evasive and that Plaintiff had a depressed affect. [R. 911]. However, a cognitive assessment of Plaintiff was within normal limits, and Plaintiff's memory, impulse, introspection, and judgment were intact and average. [R. 913]. Moreover, as to Plaintiff's reported back pain, Plaintiff had a bilateral lumbar medial branch block procedure at L2-L5, on November 7, 2019, and December 30, 2019. [R. 1071, 1060]. Immediately after each bilateral lumbar medial branch block procedure Plaintiff reported feeling "100% relief," but within a week or two of each procedure, Plaintiff reported only 75–80% relief. [R. 1071, 1060, 1066, 997].

Plaintiff was Baker Acted to JFK Medical Center because of suicidal ideation and a depressed mood, on December 10, 2019. [R. 960, 953]. While the provided treatment notes are minimal, the medical record reflects that, upon discharge, Plaintiff was diagnosed with major depressive disorder, recurrent; chronic post-traumatic stress disorder; a traumatic brain injury; "htn"; cocaine/cannabis abuse; a seizure disorder; chronic pain; and nicotine dependence. [R. 960].

25

Subsequently, on January 16, 2020, Plaintiff presented to Russell Feit, M.D., for a follow-up appointment with respect to his neck and lower back pain. [R. 997]. He reported his back pain as a 10 out of 10, although he somewhat contradictorily described it as a constant, dull ache. [R. 997]. Plaintiff's pain was alleviated by pain medicine but was exacerbated by sitting, standing, walking, lifting, bending, and lying down. [R. 997]. A general examination of Plaintiff revealed that he was in no acute distress but had tenderness and "moderate muscle spasms bilaterally of the paralumbars." [R. 998]. Accordingly, Dr. Feit recommended a lumbar facet ablation. [R. 999]. And, over the next two months, Plaintiff twice presented to Dr. Feit, with the same complaints and examination results. [R. 1051–52, 1047–48].

Lastly, on March 11, 2020, Plaintiff again visited Dr. Plante. [R. 1033]. He presented with seizures, headaches, irritability, mood, and hypersensitivity to stimulus. [R. 1033]. While Plaintiff reported "significant improvement in seizure frequency and intensity" after taking Depakote—which Dr. Plante had previously prescribed—Plaintiff stated "that it made him feel bad so he discontinued taking it." [R. 1033]. In any event, Plaintiff continued to take Carbamazepine twice daily, but noted he had "been having frequent seizures up to 3/week and on average 1-2 every couple weeks" and that he had an episode "where he had to go to the ER and was having difficulty with tonic posturing from his neck down [and] did not lose consciousness." [R. 1033]. A physical examination of Plaintiff revealed decreased sensation on the left side of Plaintiff's face, but otherwise unremarkable results. [R. 1035].

Plaintiff filled out a Supplemental Pain Questionnaire, dated December 26, 2018. [R. 370–72]. He also completed a Function Report [R. 373–80], and a Supplemental Seizure Questionnaire

from that same date. [R. 381–83]. There is also a Supplemental Seizure Questionnaire from July 9, 2019. [R. 404–07].

## C.   ALJ Decision

The ALJ issued a decision denying Plaintiff's claim for benefits on June 10, 2020. [R. 15–28]. In doing so, the ALJ explained the five-step sequential evaluation process for determining whether an individual is disabled. [R. 16–17]. At step one, the ALJ found that—while Plaintiff had engaged in substantial gainful activity in 2015 and 2016, and near substantial gainful activity in 2018—there had been a continuous twelve-month period during which Plaintiff did *not* engage in substantial gainful activity since his amended alleged onset date. [R. 17–18]. At step two, the ALJ found that Plaintiff suffers from the following severe impairments: "status post assault resulting in traumatic brain injury, seizure disorder, headaches, lumbar spine degeneration at L4-5 and L5-S1, hypertension, left shoulder rotator cuff tendinitis, major depressive disorder, anxiety, and post-traumatic stress disorder." [R. 18].

The ALJ then found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. [R. 18]. To this end, the ALJ specifically referenced Plaintiff's mental impairments and the paragraph "B" criteria, but did not mention Plaintiff's neurological impairments. [R. 18–19]. Regardless, the ALJ determined that Plaintiff had the following Residual Functional Capacity ("RFC"):

> to perform a reduced range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). Specifically, the claimant could lift and/or carry ten pounds frequently, and twenty pounds occasionally, sit for six hours, and stand and/or walk for six hours, in an eight-hour workday. The claimant should avoid hazards, such as moving machinery or unprotected heights. The claimant should not drive or operate machinery. The claimant could occasionally lift overhead with the left extremity.

> The claimant is able to perform simple routine tasks in a stable work environment with no fast-paced, high production demands. The claimant would require occasional close interpersonal interaction with coworkers and the public. The claimant would require verbal instructions given by supervisors in order to complete tasks.

[R. 19]. In crafting this RFC, the ALJ attested that she had considered all of Plaintiff's symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as all the opinion evidence and prior administrative medical findings. [R. 19].

The ALJ next followed the two-step process—first, determining if there is an underlying determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms, and then evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit his functions.   [R. 19]. To this end, the ALJ summarized Plaintiff's hearing testimony and medical records, and found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." [R. 20]. For instance, in support of such finding, the ALJ noted: (1) several normal examination results; (2) the fact that Plaintiff "admitted he was not compliant with his medication"; (3) Plaintiff's helpful physical therapy; (4) Plaintiff's limited Baker Act records; (5) Plaintiff's report of "significant improvement in seizure frequency and intensity" after taking Depakote; (6) a helpful lumbar medial branch block procedure; and (7) Plaintiff's September 2019 cocaine use. [R. 20–23]. The ALJ also expressly considered medical

opinions from various medical sources and provided reasoning for finding each opinion either persuasive or unpersuasive. [R. 23–26].

At the conclusion of step four, the ALJ explained that Plaintiff could not perform any past relevant work. [R. 26]. She noted that he was 30 years old and thus a younger individual on the date the alleged disability onset date,[17] that Plaintiff is illiterate but able to communicate in English, and that transferability of job skills was not an issue in this case because Plaintiff's past relevant work is unskilled. [R. 26]. In considering Plaintiff's age, education, work experience, and RFC, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. [R. 27]. The vocational expert testified that such jobs include "cleaner," "cafeteria attendant," and "marker." [R. 27]. Thus, the ALJ found that Plaintiff had not been under a disability as defined in the Social Security Act from January 18, 2014,[18] through the date of the ALJ's decision. [R. 27].

## II. <u>MOTIONS FOR SUMMARY JUDGMENT</u>

In his Motion for Summary Judgment, Plaintiff argues that: (1) the ALJ's finding that Plaintiff's seizures did not meet or medically equal the criteria of Listing 11.02 is unsupported by substantial evidence; (2) the ALJ did not properly evaluate the medical source opinions; and (3) the ALJ's rejection of Plaintiff's subjective allegations is not supported by substantial evidence. [R. 35].

---

[17] The ALJ incorrectly and improperly discussed Plaintiff's age on the date of the alleged disability onset, rather than Plaintiff's age on the date of the amended alleged disability onset. [R. 26]. This was because the ALJ found that Plaintiff had not been under a disability from January 18, 2014 (the alleged onset date), rather than September 26, 2018 (the amended alleged onset date). [R. 27].
[18] *See* note 17, *supra*.

In Defendant's Motion for Summary Judgment with Supporting Memorandum of Law and Response in Opposition to Plaintiff's Motion for Summary Judgment, Defendant asserts that substantial evidence supports the ALJ's finding that Plaintiff's seizure disorder did not meet or medically equal the criteria of Listing 11.02; that substantial evidence supports the ALJ's opinion evidence and prior administrative medical findings evaluation; and that substantial evidence supports the ALJ's finding that Plaintiff's statements concerning the intensity, persistence, and limiting effects of Plaintiff's alleged symptoms were not entirely consistent with the record evidence. [R. 38].

In reply, Plaintiff contends that—while an ALJ's failure to discuss a listing, in and of itself, may not merit remand—"when the ALJ fails to consider the listing *and* the substantial evidence of record indicates that the criteria may be met," there is harmful error warranting remand. [DE 40 at 1]. Further, Plaintiff reiterates that the ALJ failed to properly evaluate the medical source opinions, and that the ALJ's rejection of Plaintiff's subjective allegations concerning his headaches, spinal impairments, and seizure and mental impairments is not supported by substantial evidence. *Id.* at 6–10.

### III. <u>RELEVANT LAW</u>

Judicial review of the factual findings in disability cases is limited to determining whether the Commissioner's decision is "supported by substantial evidence and based on proper legal standards. Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." 42 U.S.C. § 405(g); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (per curiam) (internal citation omitted) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997)). Courts may

not "decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the Commissioner's conclusions of law. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "The [Commissioner's] failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007) (alteration in original) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991)).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920 (a)–(f). The ALJ must first determine whether the claimant is presently employed. If so, a finding of non-disability is made, and the inquiry concludes. 20 C.F.R. § 404.1520(b). In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments. If the ALJ finds that claimant does not suffer from a severe impairment or combination of impairments, then a finding of non-disability results, and the inquiry ends. 20 C.F.R. § 404.1520(c).

Step three requires the ALJ to compare the claimant's severe impairment(s) to those in the listing of impairments. 20 C.F.R. § 404.1520(d), subpart P, appendix 1. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that, if they are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work. *See Gibson v. Heckler*, 762 F.2d 1516, 1518 n.1 (11th

Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d).

Step four involves a determination of whether the claimant's impairments prevent him or her from performing his or her past relevant work. If the claimant cannot perform his or her past relevant work, then a *prima facie* case of disability is established. 20 C.F.R. § 404.1520(e). The burden then shifts to the ALJ to show at step five that, despite the claimant's impairments, he or she is able to perform work in the national economy in light of the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(f); *Phillips*, 357 F.3d at 1239. In order to determine whether the claimant has the ability to adjust to other work in the national economy, the ALJ may either apply the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, appendix 2, or utilize the assistance of a vocational expert. *See Phillips*, 357 F.3d at 1239–40.

## IV. <u>ANALYSIS</u>

Under the above legal framework, the Court will address the issues raised in this appeal. To resolve these issues, the Court has carefully reviewed the extensive administrative record, including the objective medical evidence, and will discuss the relevant portions as necessary to address each issue.

### A. <u>Whether Substantial Evidence Supports the ALJ's "Implicit" Finding that Plaintiff's Seizure Disorder Did Not Meet or Medically Equal the Criteria of Listing 11.02</u>

Plaintiff asserts that the ALJ did not "properly consider whether Plaintiff's seizures met, or medically equaled, the criteria of a listed impairment." [R. 35 at 5]. More specifically, Plaintiff argues that "the record demonstrates that Plaintiff's seizures met or medically equaled the criteria of Listing 11.02(B)." *Id.* In this regard, Plaintiff notes that the ALJ's decision does not even mention Listing 11.02. *Id.* Further, he argues that, "[t]o the extent the decision implies that Listing

11.02 was not met or equaled, substantial evidence does not support such a conclusion." *Id.* at 5–6. Plaintiff thereafter goes through the medical source opinions and administrative record, arguing that his seizures were at listing level and that his condition did not improve despite his compliance with medications and treatment. *Id.* at 6–11.

Defendant argues that Plaintiff failed to meet his burden of proving that his impairments met or equaled Listing 11.02. [DE 38 at 5]. Indeed, Defendant notes that the ALJ was not required to specifically discuss Listing 11.02 in coming to her determination at step three. *Id.* at 5–6. However, in any event, Defendant argues that the ALJ did in fact implicitly consider Listing 11.02 when the ALJ "discussed Plaintiff's reports and diagnosis of a seizure disorder, his treatment of a seizure disorder via medication, and diagnostic testing including a head CT and EEG" and when she "found Plaintiff's seizure disorder severe and incorporated seizure precautions in her RFC assessment." *Id.* at 6. Defendant also argues that "substantial evidence supports the ALJ's implicit finding that the severity of Plaintiff's seizure disorder did not meet or medically equal Listing 11.02." *Id.* This is because, according to Defendant, Plaintiff "failed to show that his seizures occurred despite adherence to prescribed treatment at the frequency necessary to satisfy Listing 11.02(B)." *Id.* at 7. Defendant then cites Plaintiff's purported non-compliance with his medication, an EEG in which no seizures were seen, and Plaintiff's "cocaine abuse" as supportive of the ALJ's implicit finding. *Id.* at 8.

In reply, as stated earlier, Plaintiff first argues that, "[w]hile an ALJ's failure to discuss a listing, in and of itself, may not merit remand when the listing criteria is not met, when the ALJ fails to consider the listing *and* the substantial evidence of record indicates that the criteria may be met, the error his harmful and does merit remand." [DE 40 at 1]. According to Plaintiff, "contrary

to the Commissioner's assertion, the [ALJ's] decision as a whole does not support the ALJ's 'implicit' or absent finding that the listing criteria were not met." *Id.* In connection therewith, Plaintiff notes that the record contains no evidence to support the implication that Plaintiff's seizures were drug induced, and that the ALJ's citation to Plaintiff's purported non-compliance with medications was not supported by the evidence and failed to follow SSR-16-3p and SSR 18-3p. *Id.* at 2–5.

As just stated, step three requires the ALJ to compare the claimant's severe impairment(s) to those in the listing of impairments. 20 C.F.R. § 404.1520(d), subpart P, appendix 1. However, "[w]hile the ALJ is required to consider the Listing of Impairments in making a decision at step three, [the] ALJ [is not required] to 'mechanically recite' the evidence or listings [he or] she has considered." *Flemming v. Comm'r of Soc. Sec. Admin.,* 635 F. App'x 673, 676 (11th Cir. 2015).

The claimant seeking disability benefits and/or supplemental security income carries the burden of proof to show that his impairments meet or medically equal a listed impairment. *Bellew v. Acting Comm'r of Soc. Sec.,* 605 F. App'x 917, 920 (11th Cir. 2015). "To meet the requirements of a Listing, the claimant must have a diagnosis included in the Listing and must provide medical reports documenting that the condition meets the Listing's specific criteria and duration requirement. An impairment—no matter how severe—that meets only some of the Listing requirements does not qualify." *Id.* (citations omitted). An ALJ's finding as to whether a claimant does or does not meet a listed impairment may be implied from the record and need not be explicit in his or her decision. *Id.*

Here, at step three of the required analysis, the ALJ explicitly stated that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of

one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)." [R. 18]. The ALJ then discussed Plaintiff's mental impairments and whether they met or medically equaled the criteria of Listings 12.03, 12.04, and 12.06. [R. 18].

Yet, importantly, the ALJ did <u>not</u> mention Plaintiff's neurological impairments (Plaintiff's seizures and corresponding seizure disorder) at step three, or even discuss whether Plaintiff's seizures met or medically equaled the criteria of Listing 11.02. *See* R. 18–19. While the ALJ was not required to specifically discuss Listing 11.02 or to "mechanically recite" the evidence, *Flemming*, 535 F. App'x at 676, "an ALJ's implicit conclusion regarding whether a claimant's condition meets a Listing must still be supported by substantial evidence." *Nelson v. Comm'r of Soc. Sec.*, 19-cv-788, 2021 WL 1207753, at *4 (M.D. Fla. Mar. 31, 2021) (citing *Prince v. Comm'r, Soc. Sec. Admin.*, 551 F. App'x 967, 970 (11th Cir. 2014)). And, after careful consideration of the ALJ's decision, the Court finds that the ALJ's purported "implicit" conclusion in this case is not supported by substantial evidence.

In the ALJ's decision, she found that Plaintiff's seizure disorder constituted a severe impairment. [R. 18]. Thereafter, in discussing the medical record evidence at step four, the ALJ discussed Plaintiff's reports of seizures and the medical evidence relating thereto. [R. 20–25]. Specifically, the ALJ noted: (1) Plaintiff's testimony concerning his daily seizures; (2) Plaintiff's reports of seizures in September 2018 with Dr. Abraham; (3) Plaintiff's report of seizures in his January 2019 examination with Dr. Rosenberg; (4) Plaintiff's endorsement of continued seizures in June 2019; (5) Dr. Goldstein's testimony concerning Plaintiff's seizure disorder; and (6) record evidence from early 2019 that she stated showed Plaintiff only "occasionally" experienced

seizures. [R. 20–25]. However, the ALJ largely discussed this seizure evidence in the context of Plaintiff's purported non-compliance with medication and drug use rather than in evaluating the full Listing criteria.

     1.  <u>Listing 11.02(B)</u>

In Plaintiff's Motion for Summary Judgment [DE 35], Plaintiff argues that the ALJ failed to consider whether Plaintiff's seizures met or medically equaled the criteria of Listing 11.02. Plaintiff specifically focuses his argument entirely on Listing 11.02(B). [R. 35 at 5; *see also* R. 40 at 1]. That listing provides as follows:

> 11.02 Epilepsy, documented by a detailed description of a typical seizure and characterized by A, B, C, or D:
> 
>               . . .
> 
> B.  Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C)[.]

20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.02(B). Thus, for Plaintiff's impairments to meet or medically equal the severity of Listing 11.02(B), Plaintiff's dyscognitive seizures (that is, seizures "characterized by alteration of consciousness without convulsions or loss of muscle control"), must occur at least once a week for at least three consecutive months despite Plaintiff's adherence to his prescribed treatment. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.02(B).

In this regard, section 11.00H4 provides a specific methodology for counting seizures. Multiple seizures occurring in a 24-hour period are counted as one seizure, a continuous series of seizures without a return to consciousness between seizures are counted as one seizure, and seizures that occur when a claimant is "not adhering to prescribed treatment without good reason" are not counted. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.00H4. As to what constitutes

"good reason" for not adhering to prescribed treatment, "physical, mental, education, and communicative limitations (including any language barriers)"—as well as 20 C.F.R. § 416.930(c) and 20 C.F.R. § 404.1530(c)—are to be considered. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.00H4.d. And, with respect to Listing 11.02(B)'s "despite adherence to prescribed treatment" language, section 11.00C clarifies that such language means that a claimant has "taken medication(s) or followed other treatment procedures for [his or her] neurological disorder(s) as prescribed by a physician for three consecutive months but [his or her] impairment continues to meet the other listing requirements despite this treatment." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.00C.

Here, on September 26, 2018, Plaintiff reported that he had not been compliant in taking his anticonvulsant medications. [R. 617–19]. However, that date was merely the alleged amended onset date of Plaintiff's purported disability. Even so, Plaintiff attributed this non-compliance to his dyslexia, to not understanding that he needed to take his prescribed medicine, and to his anticonvulsant medications making him feel bad. [R. 617–19]. While the ALJ thereafter repeatedly referenced Plaintiff's alleged non-compliance, the ALJ included no discussion whatsoever as to whether Plaintiff had any "good reason" for not adhering to the prescribed treatment, in accordance with 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.00H4. This is notable in the instant case considering Plaintiff's illiteracy and his repeated statements that certain medications made him "feel bad." Indeed, it is troubling to the Court that the ALJ did not attempt to contextualize Plaintiff's purported non-compliance.

But more importantly, the ALJ's reliance on Plaintiff's alleged non-compliance and statement that Plaintiff only "occasionally" experienced his seizures as of February 2019 does not

appear to be supported by the medical record evidence. In fact, during Dr. Ward's February 5, 2019 examination of Plaintiff, Plaintiff reported having "approximately 8-10 seizures per month." [R. 673–64]. At that same examination, Plaintiff's friend and roommate, Berneace Pereiro, stated that Plaintiff had been compliant with his medications since around October (when Plaintiff experienced a severe seizure which led to his hospitalization)[19] and stated that Plaintiff was nonetheless having seizure activity "once a week." [R. 673–74].

Similarly, over a year later, at Plaintiff's March 11, 2020 examination with Dr. Plante, Plaintiff reported having "frequent seizures up to 3/week and on average 1-2 every couple weeks," with an episode "where he had to go to the ER and was having difficulty with tonic posturing from his neck down [and] did not lose consciousness." [R. 1033]. Although Plaintiff noted he had stopped taking his Depakote medication because it made him feel bad, Plaintiff was still taking his prescribed Carbamazepine medication (which "is an anticonvulsant used to control certain types of seizures"). [R. 1033; DE 35 at 22]. And, the medical record evidence between February 2019 and March 2020 seems to demonstrate that Plaintiff had difficulty tolerating certain of his other anticonvulsant medications. [R. 722].

Thus, at the very least, this Court is unable to determine whether the ALJ sufficiently considered Listing 11.02(B)—more specifically, whether the ALJ considered any "good reason" when determining Plaintiff was non-compliant with his medications. Further, the Court is unable to determine whether the ALJ found Plaintiff's seizures occurred with the requisite frequency to meet or medically equal Listing 11.02(B). The ALJ's emphasis on Plaintiff's purported non-

---

[19] It appears that this is in reference to Plaintiff's September 26, 2018 hospital visit (or, the amended alleged onset date).

compliance (which seems to lack substantial evidence and fails to consider whether good reason exists for non-compliance) simply provides this Court with no basis to find that the ALJ adequately considered Listing 11.02(B) or its full criteria.[20] The ALJ's failure to even mention Listing 11.02 is concerning to this Court in light of the ALJ's explicit reference to other Listings at step three. While it is not necessary for the ALJ to mechanically recite a Listing, under the facts of this case, where the evidence establishes that the 11.02(B) criteria *may* be met, and where the ALJ never even mentioned Listing 11.02 (but chose to mention other Listings), remand is required. *See Flemming*, 635 F. App'x at 676; *Ingram*, 496 F.3d at 1260.

2. Plaintiff's "Drug Abuse"

Further, the ALJ's references to Plaintiff's "drug abuse" is concerning. [R. 23]. Under 20 C.F.R. §§ 404.1535(a) and 416.935(a), if the ALJ finds that a claimant is "disabled and ha[s] medical evidence of [the claimant's] drug addiction or alcoholism, [the ALJ] must determine whether [the claimant's] drug addiction or alcoholism is a contributing factor material to the determination of disability." Additionally, "[t]he key factor [the ALJ] will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether [the ALJ] would still find [the claimant] disabled if [the claimant] stopped using drugs or alcohol." 20 C.F.R. § 404.1535(b)(1); 20 C.F.R. § 416.935(b)(1).

---

[20] Plaintiff's citation to SSR 18-3-p is unavailing. Plaintiff is correct that the ALJ "only perform[s] the failure to follow prescribed treatment analysis . . . after [he or she] find[s] that an individual is entitled to disability or [is] eligible for statutory blindness benefits under titles II or XVI of the Act, regardless of whether the individual followed the prescribed treatment" and that the ALJ "will not determine whether an individual failed to follow prescribed treatment if [he or she] finds the individual is not disabled." SSR 18-3p, No. SSA-2016-0034, 2018 WL 4945641, at *3 (Oct. 2, 2018). *However*, Listing 11.02(B) requires determining whether Plaintiff "adhere[d] to prescribed treatment." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.02(B). Thus, it was not error for the ALJ to discuss compliance despite a finding that Plaintiff was not disabled.

Here, although there was no finding of drug addiction or mention of such as an impairment, the ALJ discussed Plaintiff's "drug abuse" and cocaine usage in her decision, stating that Plaintiff's cocaine use could affect his seizure condition. [R. 23]. The ALJ did so while simultaneously discussing plaintiff's "occasional[]" seizures and improvements on medication, thereby implicitly finding that Plaintiff's seizures were not of sufficient severity to satisfy Listing 11.02(B). Thus, it appears the ALJ's conclusion that Plaintiff's cocaine use could affect his seizure condition is internally inconsistent with 20 C.F.R. §§ 404.1535(a) and 416.935(a), which only require the ALJ to engage in an analysis of whether drug addiction is a contributing factor material to the determination of disability *after* a finding of disability. Though nothing would seemingly preclude the ALJ from engaging in such an analysis *without* a finding of disability, and although there is nothing explicitly linking Plaintiff's "drug abuse" and cocaine use to "drug addiction," it is odd that the ALJ chose to engage in such analysis or comment that Plaintiff's "use of cocaine could affect [his] seizure condition" when it was "unclear from the record how much of an impact the drug use had." [R. 23]. Indeed, the record evidence seems to indicate that Plaintiff only used cocaine one time following his amended alleged onset date. [R. 941].

3.   The ALJ's Errors as to the Date of Claimed Disability and Age of Petitioner

As discussed in note 17, *supra*, the ALJ erroneously and improperly found a claimed disability onset date of January 18, 2014, when in reality the correct claimed onset date was September 26, 2018. [R. 26–27]. This caused the ALJ to further err in finding that the relevant age of Plaintiff was 30 years of age, when in fact Plaintiff was 35 years of age as of the amended alleged onset date. In conjunction with the other errors of the ALJ, these factual errors of the ALJ

cause this Court some concern and, considered cumulatively, lead the Court to find that the ALJ's Decision was not supported by substantial evidence.

4. Overall

In light of the ALJ's failure to specifically mention Listing 11.02 (while choosing to explicitly reference other Listings);[21] the ALJ's emphasis on Plaintiff's purported non-compliance with his medications, without any discussion of "good reason" as required (which provides this Court with no way to ascertain whether the ALJ adequately considered the remainder of Listing 11.02(B)); the ALJ's reference to Plaintiff's drug abuse (without a finding of disability and with seemingly minimal evidence); and the ALJ's factual errors as to the claimed onset date and relevant age of the Plaintiff, the Court finds that substantial evidence does not support the ALJ's Decision and that reversal and remand is warranted. Accordingly, on remand, the ALJ should specifically address whether Plaintiff's seizures meet or medically equal the severity of Listing 11.02(B). The ALJ shall also utilize the correct claimed disability onset date and correct relevant age of the Plaintiff when issuing a Decision.

Further, based on these findings, the Court declines to address whether the ALJ properly evaluated the medical source opinions or whether the ALJ's rejection of Plaintiff's subjective allegations is supported by substantial evidence. *See Dieffenbach o/b/o Dieffenbach v. Comm'r of Soc. Sec.*, No. 21-80342-CIV, 2022 WL 3444999, at *8 (S.D. Fla. Aug. 17, 2022), and cases cited therein. While those issues involve a later step in the five-step sequential evaluation process, it is abundantly clear that the ALJ's weighing of the opinion evidence and determination as to

---

[21] The Court clarifies that the ALJ was not *required* to discuss Listing 11.02(B). It is the ALJ's reference to other Listings and the other issues, but not Listing 11.02, as noted above, that causes this Court concern.

Plaintiff's credibility were improperly colored by a purported non-compliance and drug abuse for which there is a seeming lack of evidence after the amended alleged onset date. The Court trusts that on remand, the ALJ will properly reconsider the evidence in light of the Court's concerns as addressed above. The Court expresses no opinion as to the ALJ's ultimate Decision on remand.

## IV. CONCLUSION

In light of the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1. The decision of the Commissioner is **REVERSED AND REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. On remand, the Commissioner should consider whether Plaintiff's seizures meet or medically equal the severity of Listing 11.02(B), utilize the correct claimed disability onset date and relevant age of the Plaintiff, and reassess the entire record and reconsider and weigh all available medical records and medical opinion evidence, as required by the applicable rules and law.

2. Accordingly, Plaintiff's Motion for Summary Judgment [DE 35] is hereby **GRANTED**, and Defendant's Motion for Summary Judgment [DE 38] is hereby **DENIED**.

3. Pursuant to Federal Rule of Civil Procedure 58, a separate judgment shall be entered in accordance with this Order.

**ORDERED AND ADJUDGED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 30th day of September, 2022.

WILLIAM MATTHEWMAN
United States Magistrate Judge